UNTHANK v WOLFE

Docket No. 284182. Submitted December 3, 2008, at Detroit. Decided
December 23, 2008, at 9:15 a.m. Vacated in part, 483 Mich ___.

Christine Wolfe sought a divorce from Kenneth Barnett in the Wayne
Circuit Court, Bill Callahan, J. She decided during the divorce
proceedings to allow Phillip and Phyllis Unthank to adopt her
unborn child, whom Barnett denied fathering. Following the
child's birth, Wolfe executed a document under MCL 710.23d(1)(c)
temporarily transferring physical custody of the child to the
Unthanks. Genetic testing subsequently revealed that Barnett was
the father, and he sought custody of the child in the divorce
proceeding. The Unthanks petitioned the Wayne County Probate
Court for appointment as the child's temporary guardians, which
the court, June E. Blackwell-Hatcher, J., granted. Over the next
five years, a complex series of proceedings in both the circuit court
and the probate court followed. Barnett continued his efforts to
gain custody in both courts. While Wolfe had signed powers of
attorney delegating her parental powers to the Unthanks, she
subsequently revoked them and filed petitions in the circuit court
requesting that the child be returned to her. The Unthanks also
sought custody in both courts, and each court entered numerous
orders concerning the child and the various attempts to gain
custody or guardianship of him. Judge Blackwell-Hatcher again
appointed the Unthanks as temporary guardians, which Wolfe
appealed in the circuit court before Judge Callahan. Eventually,
Judge Blackwell-Hatcher was assigned to the custody matter in
the circuit court and granted Wolfe parenting time. Judge Calla-
han denied Wolfe's appeal of Judge Blackwell-Hatcher's guardian-
ship order. Throughout this time, the relationship between Wolfe
and the Unthanks continued to deteriorate dramatically, leading
to motions to suspend Wolfe's parenting time and even a physical
altercation. Wolfe called the child "Cody" when he was in her care,
and the Unthanks called him "Duane." A trial of the custody
matter finally ensued, and, more than one year after it ended,
Judge Blackwell-Hatcher denied the Unthanks' custody motion,
awarded sole custody to Wolfe, and denied Wolfe's request for
attorney fees. The Unthanks appealed, and Wolfe cross-appealed.

The Court of Appeals *held*:

The Unthanks lacked standing to pursue custody of the child. Under MCL 710.23d(1)(c)(*iii*), Wolfe retained full parental rights to the child throughout the proceedings in the circuit court and the probate court, and both courts erred by exploring custodial options after Wolfe revoked her permission for temporary placement with the Unthanks.

1. Two statutes confer standing in child custody actions. The Unthanks lacked standing under MCL 722.26c(1), which allows a third party to bring a custody action in certain circumstances, because the child was never formally placed with them for adoption and Wolfe and Barnett were married at the time of the child's conception.

2. The Unthanks also lacked standing under MCL 722.26b(1), which allows a guardian to bring a custody action. While Judge Blackwell-Hatcher appointed them as the child's temporary guardians, they were not eligible under MCL 700.5204(2) to be guardians for purposes of MCL 722.26b(1) when they filed their third-party custody action. MCL 700.5204(2)(b) requires a parent to have given current permission for the child to reside with another person before that person may seek a guardianship order. Barnett, however, never agreed to permit the child to reside with the Unthanks, and Wolfe unequivocally revoked her permission before the Unthanks brought their custody action. Despite the Unthanks' status as temporary guardians, Wolfe's revocation eliminated their authority as the child's guardians, and they lacked any legal basis to claim a substantive right to custody.

3. Judge Blackwell-Hatcher made no findings regarding Wolfe's request for attorney fees and expenses under MCR 3.206(C), which allows the court to award attorney fees and expenses in a domestic relations action if the requesting party demonstrates that he or she is unable to bear the expense of the action and that the other party is able to pay. A remand is necessary to resolve that issue. Judge Blackwell-Hatcher's denial of attorney fees under MCR 2.114 and 5.114, however, was proper.

Custody award and denial of attorney fees under MCR 2.114 and 5.114 affirmed and case remanded for further proceedings.

GUARDIAN AND WARD — CHILD CUSTODY — STANDING.

Appointment as the temporary guardian of a child does not by itself give the temporary guardian standing to pursue custody of the child (MCL 722.26b, 722.26c).

*Scott Bassett* and *Williams, Williams, Rattner & Plunkett, P.C.* (by *John F. Mills*), for Phillip and Phyllis Unthank.

*Faupel, Fraser & Fessler* (by *Marian L. Faupel* and *James Fraser*) for Christine Wolfe and Kenneth Barnett.

Before: BORRELLO, P.J., and DAVIS and GLEICHER, JJ.

GLEICHER, J. In this child custody action, third-party custodians Phillip and Phyllis Unthank appeal as of right the circuit court's order granting Christine Wolfe, the biological mother of the minor child involved, sole physical and legal custody. We affirm regarding custody, but remand for further proceedings concerning Wolfe's motion for attorney fees pursuant to MCR 3.206(C).

### I. FACTS AND PROCEEDINGS

In May 2001, Christine Wolfe married Kenneth Dale Barnett, and later that year Wolfe gave birth to Samantha Barnett. In May 2002, Wolfe filed a complaint for divorce. During the divorce proceedings, Wolfe revealed that she was pregnant. Barnett denied paternity of the unborn child. Wayne Circuit Court Judge Bill Callahan entered a divorce judgment that awarded Wolfe and Barnett joint legal and physical custody of Samantha, but included no provision regarding the unborn child.

During the divorce proceedings, Wolfe decided to allow plaintiffs (the Unthanks) to adopt the unborn child. Wolfe and the Unthanks contemplated an adoption pursuant to MCL 710.23a, which allows a parent to "make a direct placement of the child for adoption by making a temporary placement under" MCL 710.23d. MCL 710.23a(1). "A temporary placement becomes a

formal placement when the court orders the termination of the rights of the parent or parents . . . and approves placement under [MCL 710.51]." *Id.*

On January 23, 2003, Wolfe bore the child involved in this dispute, and the next day executed a statement transferring his physical custody to the Unthanks, pursuant to MCL 710.23d(1)(c) of the Michigan Adoption Code. This provision contemplates that in furtherance of a direct placement adoption, a parent with legal and physical custody of a child "may make a temporary placement of the child" through a document "evidencing the transfer of physical custody of the child." The document must also contain, among other things, a declaration that

> unless the parent or guardian and the prospective adoptive parent agree otherwise, the prospective adoptive parent has the authority to consent to all medical, surgical, psychological, educational, and related services for the child *and language indicating that the parent or guardian otherwise retains full parental rights to the child being temporarily placed and that the temporary placement may be revoked by the filing of a petition under subsection (5).*[1] [MCL 710.23d(1)(c)(*iii*) (emphasis added).]

The Unthanks called the child Duane and took him home from the hospital when he was one day old.

In February 2003, genetic testing revealed that Barnett had fathered the child. Shortly after he received the genetic testing results, Barnett filed a motion in the divorce case seeking custody of the child, accompanied by a birth certificate listing the child's name as Cody Thomas Barnett. Initially, Wolfe opposed Barnett's efforts to obtain custody of his son. When the Unthanks

---

[1] Subsection 5, MCL 710.23d(5), addresses the procedure that a parent or guardian must follow when he or she petitions to regain custody of a child who has been temporarily placed.

learned of Barnett's interest in custody of the child, they filed a petition in the probate court requesting appointment as the child's "co-temporary guardians." On February 27, 2003, Wayne County Probate Court Judge June Blackwell-Hatcher appointed the Unthanks as temporary coguardians. The letters of guardianship bore an expiration date of April 2, 2003.

On March 6, 2003, Barnett filed in the probate court a petition requesting return of the child, which Judge Blackwell-Hatcher denied. The probate court extended the Unthanks' temporary guardianship through April 24, 2003. Barnett then shifted his custody efforts to the circuit court.[2] On April 22, 2003, Judge Callahan entered an "Amended Consent Judgment of Divorce," which provided: "IT IS FURTHER ORDERED AND ADJUDGED that the parties to this action have mutually agreed to place the unborn child of the parties, presently *in utero*, for adoption. Accordingly, no further provision for said child is made in this Judgment of Divorce." Apparently in response to Barnett's continuing campaign for the child's custody, in July 2003, the circuit court entered an order awarding Wolfe "full legal and physical custody" of "DUANE UNTHANK, during the pendency of this matter or until the further order of the Court." The order additionally provided: "IT IS FURTHER ORDERED that PHILLIP AND PHYLLIS UNTHANK are the agents of the custodial parent, CHRISTINE WOLFE, and in whom's [sic] residence the minor child will remain until the further order of the Court."

In April 2003, September 2003, December 2003, June 2004, and December 2004, Wolfe signed powers of

---

[2] The record of the divorce proceedings has not been provided to this Court. We have derived the facts recited here from the portions of the circuit court record that appear in the probate court record.

attorney delegating "all of my parental powers" to the Unthanks. In November 2003, Judge Callahan ordered Barnett to pay child support, undergo drug testing, and complete a psychological evaluation. Barnett disobeyed all these orders. Although Wolfe obtained a psychological examination, she failed to undergo the drug testing ordered by Judge Callahan.

On March 20, 2005, Wolfe revoked the December 2004 power of attorney. In a letter written to the Unthanks, Wolfe explained that "[i]t has been my decision to raise my child," and requested that within 48 hours the Unthanks "return . . . Duane (Cody) to me." The Unthanks did not respond. On March 29, 2005, Wolfe filed a pro se petition in the divorce proceeding, requesting that the court order the immediate return of her child.

On May 15, 2005, the Unthanks filed in the divorce action a "Complaint for Third Party Custody." Wolfe responded with an emergency motion for summary disposition, alleging that the Unthanks lacked standing to seek custody. Judge Callahan agreed that the Unthanks lacked standing to bring a third-party custody action and indicated that he would not entertain their third-party custody complaint unless the probate court appointed them temporary coguardians of the child. On June 3, 2005, the Unthanks filed a petition in the Wayne County Probate Court seeking an order of temporary guardianship.[3]

On June 8, 2005, the parties appeared before Judge Blackwell-Hatcher in the probate court. Counsel for the Unthanks advised Judge Blackwell-Hatcher that his clients had requested a temporary guardianship "for

---

[3] The Unthanks had previously filed a petition for permanent guardianship of the child. As further discussed later, the probate court "stayed" the petition on June 30, 2005.

two reasons": to confer standing in a custody action and to allow the Unthanks to make medical decisions regarding the child. The Unthanks' counsel further represented:

> And this whole matter should and will go back to Judge Callahan. . . .
>
> So we're here solely to seek Temporary guardianship; solely to have this go back to Judge Callahan. And, Judge Callahan will determine what is best for this child, but we fear, unless Judge Callahan can get to the merits, to have a home study done; to direct that the tests which were ordered and never completed, be done; that Duane has lived his entire life with the Unthanks will be moved. Up until quite recently he was Duane; quite recently he became Cody for some reason he decided to change his name. I have fears for his best interests, but I don't ask this Court to become enmeshed in that custody decision, it's Judge Callahan's.

Wolfe's counsel argued that because Wolfe had revoked the final power of attorney and filed a petition requesting the child's return, the Unthanks could not qualify for a guardianship.[4] The Unthanks' counsel replied that Wolfe "has smoked marijuana" and "has a history of making poor choices . . . ." Judge Blackwell-Hatcher expressed the following: "I'm not convinced [Wolfe] has made diligent efforts to get her child back. Her reasoning for not doing it isn't logical." After additional argument and discussion with counsel, Judge Blackwell-Hatcher ruled:

> I think pursuant to the statute, the statutory requirement has been met. I do have some concerns, what I'm going to do is appoint Philip [sic] and Phyllis Unthank as the Temporary guardians, but their letters are going to

---

[4] Wolfe's counsel invoked *Deschaine v St Germain*, 256 Mich App 665; 671 NW2d 79 (2003), which we will discuss in more detail later.

expire on June 30th. At that time, I'm going to set it for a
full hearing, on that day at 11:00.

On June 15, 2005, Wolfe appealed in the circuit court
Judge Blackwell-Hatcher's order appointing the Un-
thanks as temporary coguardians. The appeal was as-
signed to Judge Callahan, who failed to decide it for
another 11 months. Meanwhile, on June 23, 2005, the
Unthanks again filed a circuit court action seeking
custody of the child, which was also assigned to Judge
Callahan. That same day, Wolfe filed another petition in
the circuit court requesting immediate return of the
child. And on June 24, 2005, Wolfe and Barnett stipu-
lated the entry of an order in the divorce action stating
that Wolfe would be awarded "the full legal and physical
custody, control, maintenance and education of the
parties' minor son CODY THOMAS BARNETT." A
handwritten provision at the end of the stipulated order
stated that the order "does not affect" the guardianship
orders "through June 30, 2005," or the circuit court
custody case initiated by the Unthanks.

On June 30, 2005, the parties appeared before Judge
Blackwell-Hatcher for a hearing regarding the tempo-
rary guardianship order scheduled to expire that day.
Counsel for the Unthanks immediately informed Judge
Blackwell-Hatcher that MCL 722.26(b) required that
the probate court stay further proceedings until dispo-
sition of the child custody action in the circuit court.[5]
Wolfe's counsel urged Judge Blackwell-Hatcher to order

---

[5] MCL 722.26b(4) provides in pertinent part that

   [u]pon the filing of a child custody action brought by a child's
   guardian or limited guardian, guardianship proceedings concern-
   ing that child in the probate court are stayed until disposition of
   the child custody action. A probate court order concerning the
   guardianship of the child continues in force until superseded by a
   circuit court order.

the Unthanks to return the child to Wolfe. Judge Blackwell-Hatcher stayed the probate proceedings pending the outcome of Wolfe's appeal of the temporary coguardianship appointment.[6]

On July 13, 2005, the Wayne Circuit Court transferred the custody matter from Judge Callahan to Judge Blackwell-Hatcher. The next day, the parties and their lawyers gathered in Judge Blackwell-Hatcher's courtroom. Judge Blackwell-Hatcher expressed dismay regarding her assignment to the case and reflected as follows:

> Well let me just say, as a preliminary matter that, this has been very confusing with the way that it's happened and reviewing the transcript of the prior hearing. I think that some of the things that were said to me were, at best, misleading, at worst, maybe intentional. I'm really kind of concerned. I understand the statute and the reasoning for having cases reassigned to the Probate Judge to sit as a Circuit Judge in Child Custody actions is because it's assumed that the Probate Judge had extensive experience with the family in the guardianship. And, in fact, I didn't at all. The only reason I very reluctantly and very narrowly appointed a temporary guardian was because I was assured that Judge Callahan was so invested in this case, that all he needed was that so that he could flush it out . . . .

Counsel for the Unthanks argued that because the child custody filing stayed the probate proceedings, "any guardianship orders then, in effect, remain during the pendency of the Custody Act . . . ." Judge Blackwell-Hatcher ultimately expressed the following:

> But I think the main point is you've appealed my appointment of the guardian.
>
> Why would we go into this extensive custody, all these extensive custody issues when, if your appeal is granted,

---

[6] Judge Blackwell-Hatcher's order did not enter until September 6, 2005.

they have no standing and this matter will be dismissed by me as a Circuit Judge, unless someone else has to hear it, I don't know.

Judge Blackwell-Hatcher denied Wolfe's renewed request for immediate return of the child and refused to hear a motion requesting the child's return unless Wolfe's counsel withdrew the guardianship appeal. Wolfe was afforded parenting time, but not overnight visitation.

During the 11 months that Judge Callahan considered the appeal of Judge Blackwell-Hatcher's guardianship decision, the relationship between Wolfe and the Unthanks dramatically deteriorated. In August 2005, the Unthanks moved to suspend Wolfe's parenting time. The motion averred that Wolfe had fed the child meat, notwithstanding that the Unthanks maintained him on a vegetarian diet. Additional allegations in the motion included that Wolfe (1) smoked cigarettes in the child's presence despite his asthma, (2) drove the child in a "car with the windows in the back . . . rolled up in 90° weather," even though the Unthanks believed that Wolfe's vehicle lacked air conditioning, and (3) permitted the child to see Barnett, who the Unthanks claimed had an "established abusive background." The Unthanks further claimed that the child had an abrasion on his chin and a cut on his lip after visits with Wolfe.

On September 2, 2005, Phyllis Unthank unilaterally suspended Wolfe's parenting time. Judge Blackwell-Hatcher appointed a guardian ad litem to investigate the Unthanks' assertions. The guardian ad litem concluded that the Unthanks' allegations lacked merit and that no basis existed for the suspension of Wolfe's visitation. Judge Blackwell-Hatcher reinstated Wolfe's parenting time.

In March 2006, Wolfe and Phyllis Unthank argued while exchanging the child, and a physical altercation ensued. Wolfe refused to return the child to the Unthanks, and Phyllis Unthank called the police. The police returned the child to the Unthanks several days later. At an April 2006 hearing regarding these events, Judge Blackwell-Hatcher ordered that future exchanges of the child occur in a public place. The parties' disagreements regarding the child extended to virtually every aspect of the boy's life. For example, throughout the four years of the custody dispute, Wolfe referred to the child as "Cody" when he was in her care, while the Unthanks called him "Duane."

On May 19, 2006, Judge Callahan entered an order denying Wolfe's appeal of Judge Blackwell-Hatcher's order for temporary coguardianship. In June 2006, the Unthanks filed another motion to suspend Wolfe's parenting time, primarily complaining that the child had "rope burns" on the back of his neck after a visit with Wolfe. The Unthanks initiated an investigation by Child Protective Services (CPS), which declined to take further action after a social worker viewed the reddened areas. At a hearing conducted on July 12, 2006, Wolfe testified that the child had sustained a small injury while playing with his older sister and a jump rope. Judge Blackwell-Hatcher admonished Wolfe to supervise the children more carefully, but refused to suspend Wolfe's parenting time.[7]

On October 12, 2006, the parties commenced a custody trial, which continued on October 13, 2006, and January 26, 2007. The trial witnesses included the parties, the guardian ad litem, and a psychologist who

---

[7] At the subsequent custody trial, Phyllis Unthank admitted that she had made a second CPS referral regarding Wolfe, which CPS investigated but failed to pursue.

had evaluated Wolfe and Barnett in 2003. On February 20, 2008, more than a year after the trial concluded, Judge Blackwell-Hatcher entered an opinion and order denying the Unthanks' motion for custody, awarding sole custody of the child to Wolfe, and denying Wolfe's request for attorney fees.

## II. ANALYSIS

### A

The Unthanks raise several challenges to the soundness of Judge Blackwell-Hatcher's opinion and order awarding Wolfe custody of the child. But first we must address a preliminary and potentially dispositive question of law. We recognize that the parties do not specifically devote arguments in their appellate briefs to the matter of the Unthanks' standing. However, as reflected within our factual and procedural summary, the parties did raise the issue of standing before the circuit and probate courts. In any event, because the question of standing constitutes an important preliminary legal issue for which we have all the relevant facts, we choose to address it at the outset of our analysis. *Detroit Leasing Co v Detroit*, 269 Mich App 233, 237-238; 713 NW2d 269 (2005).

"The question of standing is not merely whether a party has a 'personal stake' in the outcome that will ensure 'sincere and vigorous advocacy.' " *Bowie v Arder*, 441 Mich 23, 42; 490 NW2d 568 (1992) (citation omitted). Additionally,

"[o]ne cannot rightfully invoke the jurisdiction of the court to enforce private rights, or maintain a civil action for the enforcement of such rights, unless one has in an individual or representative capacity some real interest in the cause of action, or a legal or equitable right, title, or interest in the

subject matter of the controversy. This interest is generally spoken of as 'standing' . . . ." [*Id.* at 42-43 quoting 59 Am Jur 2d, Parties, § 30, p 414.]

" 'Whether a party has standing is a question of law that we review de novo.' " *Manuel v Gill*, 481 Mich 637, 642; 753 NW2d 48 (2008) (citation omitted).

Two pertinent statutes confer standing in child custody actions, MCL 722.26b and MCL 722.26c. In MCL 722.26c, our Legislature has provided, in relevant part:

(1) A third person may bring an action for custody of a child if the court finds either of the following: ˙

(a) Both of the following:

(*i*) The child was placed for adoption with the third person under the adoption laws of this or another state, and the placement order is still in effect at the time the action is filed.

(*ii*) After the placement, the child has resided with the third person for a minimum of 6 months.

(b) All of the following:

(*i*) The child's biological parents have never married to one another.

(*ii*) The child's parent who has custody of the child dies or is missing and the other parent has not been granted legal custody under court order.

(*iii*) The third person is related to the child within the fifth degree by marriage, blood, or adoption.

The Unthanks lacked standing under the clear and unambiguous terms of MCL 722.26c(1) because the child was never formally placed with them for adoption. Although Wolfe initially executed a statement transferring physical custody of the child at the time of his birth, a consummated adoptive placement was thwarted by Barnett's refusal to consent to the adoption and Wolfe's written revocation of the temporary

placement, pursuant to MCL 710.23d(1)(c)(*iii*). The plain language of MCL 710.23d(1)(c)(*iii*) recognizes that "the parent or guardian otherwise retains full parental rights to the child being temporarily placed and that the temporary placement may be revoked by the filing of a petition under [MCL 710.23d(5)]." Furthermore, the child's biological parents were married at the time of his conception, rendering MCL 722.26c(1)(b) inapplicable.

The Unthanks presumably recognized their lack of standing under MCL 722.26c and instead attempted to gain standing through appointment as the child's temporary guardians. The guardianship statute relevant here provides that a "guardian or limited guardian of a child has standing to bring an action for custody of the child as provided in this act." MCL 722.26b(1). In this case, however, the Unthanks were not eligible to be guardians for the child under MCL 700.5204(2) *when they filed their third-party custody action.* MCL 700.5204(2) permits the probate court to appoint a guardian for an unmarried minor under any of the following circumstances:

> (a) The parental rights of both parents or the surviving parent are terminated or suspended by prior court order, by judgment of divorce or separate maintenance, by death, by judicial determination or mental incompetency, by disappearance, or by confinement in a place of detention.
>
> (b) The parent or parents permit the minor to reside with another person and do not provide the other person with legal authority for the minor's care and maintenance, and the minor is not residing with his or her parent or parents when the petition is filed.
>
> (c) All of the following:
>
> (*i*) The minor's biological parents have never been married to one another.

(*ii*) The minor's parent who has custody of the minor dies or is missing and the other parent has not been granted legal custody under court order.

(*iii*) The person whom the petition asks to be appointed guardian is related to the minor within the fifth degree by marriage, blood, or adoption.

The only subsection of this statute potentially applicable under the circumstances of this case is subsection 2(b), which requires that the "parent or parents permit the minor to reside with another person . . . ." But Barnett never agreed to permit the child to reside with the Unthanks, and Wolfe unequivocally revoked her permission in March 2005. In *Deschaine v St Germain*, 256 Mich App 665, 669-670; 671 NW2d 79 (2003), this Court definitively construed MCL 700.5204(2)(b) as requiring that a parent have given *current* permission for the child to reside with another person before that person may seek a guardianship order. The mother in *Deschaine* had occasionally allowed her child to live with the child's maternal grandparents. *Id.* at 666. Immediately after the mother's death, the grandparents took the child to their home, over the objection of the child's father. The grandfather then filed a petition for temporary guardianship, which the circuit court granted. The father again objected, and the circuit court ultimately decided that because the grandfather lacked current parental permission to house the child, he did not satisfy the conditions of MCL 700.5204(2)(b) and could not obtain guardianship of any type. The circuit court thus concluded that the grandfather lacked standing to petition for the child's custody, and this Court affirmed. *Deschaine, supra* at 667.

The Unthanks filed their first custody petition in May 2005. By then, Barnett had demonstrated unwavering opposition to their continued custody of the

child, and Wolfe had revoked permission for the child to continue to reside with the Unthanks. Because neither parent permitted the child to reside with the Unthanks, the Unthanks could not possibly have qualified as the child's guardians. Therefore, they lacked standing to pursue custody of the child under MCL 722.26b.

Despite their inability to establish standing under MCL 722.26c or MCL 722.26b, as limited by the requirements of MCL 700.5204(2), the Unthanks waged a full-scale custody battle on the basis of their appointment as the child's temporary coguardians. The Unthanks argued in the circuit and probate courts that as the child's temporary coguardians, they achieved standing under MCL 722.26b(1) because under MCL 700.5213(3), a temporary guardian enjoys the status of a permanent guardian. Our Supreme Court's holding in *In re Clausen*, 442 Mich 648; 502 NW2d 649 (1993), soundly rebuts the Unthanks' contention concerning temporary custody, as does a pertinent provision of the Michigan Court Rules.

*Clausen* and the instant case share important similarities. Both involve a failed adoption and a subsequent claim for third-party custody. In *Clausen*, a Michigan couple, Roberta and Jan DeBoer, sought to adopt a child born in Iowa on February 8, 1991. Cara Clausen, the child's mother, identified Scott Seefeldt as the child's father, and by February 14, 1991, Seefeldt and Clausen had released custody of the child. The DeBoers then filed in Iowa a petition for adoption. On February 25, 1991, an Iowa district court terminated the parental rights of Clausen and Seefeldt and granted the DeBoers custody of the child. The DeBoers promptly returned to Michigan with the baby. Nine days later, Clausen moved to revoke her release of the child's custody and revealed that Daniel Schmidt was the child's father. Schmidt

filed an affidavit of paternity and sought to intervene in the adoption proceeding. Subsequently, an Iowa court concluded that the previous termination of parental rights was void with respect to Schmidt and denied the DeBoers' petition to adopt the child. Iowa's appellate courts affirmed these decisions. *Id.* at 657-659.

The Iowa district court then ordered the DeBoers to return the child to Iowa, which the DeBoers refused to do. While appeals pended in Iowa, the DeBoers filed a petition in Michigan seeking jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA). The petition requested that the Washtenaw Circuit Court enjoin enforcement of the Iowa custody order or modify it to give the DeBoers custody. The circuit court entered an ex parte temporary restraining order directing that the child remain with the DeBoers. Schmidt filed "a motion for summary judgment" requesting the dismissal of the preliminary injunction, which the circuit court denied. This Court reversed the circuit court, concluding that the circuit court lacked jurisdiction under the UCCJA and that the DeBoers lacked standing. *Id.* at 659-660.

After this Court's decision, a Michigan attorney previously appointed coguardian ad litem for the child filed a complaint for custody in the Washtenaw Circuit Court. The circuit court conducted a hearing and entered an "order continuing status quo," which permitted the DeBoers to retain custody. Our Supreme Court then granted leave to appeal.[8] *Id.* at 660-661.

[8] We observe that the Iowa and Michigan trial and appellate courts conducted the proceedings in *Clausen* with expedition. The entire process, including two state trial court judgments and four appeals, concluded in approximately two years. In stark contrast, the instant custody proceedings dragged slowly on for five years in the Wayne circuit and probate courts.

The first three sections of the Supreme Court's analysis in *Clausen* concerned jurisdictional and procedural issues under the UCCJA. *Id.* at 661-678. In part V, the Supreme Court examined whether the DeBoers had standing to claim custody of the child. *Id.* at 678. After rejecting the DeBoers' claim of standing under the UCCJA, the Supreme Court considered their assertion that "they had a substantive right to custody because they had custody pursuant to the February 25, 1991, order of the Iowa district court." *Id.* at 681. The Supreme Court soundly rejected this contention, explaining that "a third party does not obtain . . . a substantive right [to custody] by virtue of the child's having resided with the third party." *Id.* at 682. In a paragraph of the opinion foreshadowing this case, the Supreme Court observed:

> It may be that the Iowa district court's February 25, 1991, order appointing the DeBoers as custodians during the pendency of the Iowa adoption proceeding was sufficiently analogous to a Michigan guardianship (which would create standing) to have given them standing to prosecute a custody action during the effectiveness of that order. However, as the Court of Appeals said, when the temporary custody order was rescinded, they became third parties to the child and no longer had a basis on which to claim a substantive right of custody. [*Id.* at 683.]

Similarly in this case, irrespective of the temporary guardianship order, Wolfe's revocation of the initial temporary placement agreement, given in contemplation of the Unthanks' adoption of her child, eliminated their authority to serve as the child's guardians. At that point, the Unthanks lacked any legal basis on which to claim a substantive right of custody. Unlike the DeBoers, the Unthanks later convinced a court to appoint them as the child's temporary coguardians. But this effort to avoid the guardianship statute cannot serve to

create substantive custodial rights. The Supreme Court emphasized in *Clausen* that the "safeguards in the guardianship statute provide protection against manipulative attempts to temporarily obtain possession and use that as the basis for a Child Custody Act action." *Id.* at 691.

The statutory language regarding temporary guardianship manifests one such safeguard. In MCL 700.5213, the Legislature set forth the procedures governing the probate court's appointment of a guardian. Subsection 3 provides: "If necessary, the court may appoint a temporary guardian with the status of an ordinary guardian of a minor, but the temporary guardian's authority shall not exceed 6 months." MCL 700.5213(3). The term "if necessary" demonstrates the Legislature's intent that a trial court consider whether temporary guardianship constitutes a needed stepping-stone on the path to permanent guardianship. The inherently brief duration of a temporary guardianship bespeaks the Legislature's concern that a temporary guardianship exist only long enough to facilitate the child's maintenance while a permanent guardianship is finalized.

A second safeguard against manipulative efforts to engineer standing resides within the Michigan Court Rules. MCR 5.403(A) envisions that the "court may appoint a temporary guardian only in the course of a proceeding for permanent guardianship." The Unthanks recognized that after Wolfe withdrew her consent to the child's initial placement with them, they could never qualify as the child's permanent guardians. The Unthanks sought temporary guardianship primarily to bypass the standing requirements of the Child Custody Act, as reflected by their argument in the lower courts that a temporary guardianship would confer the

same standing as full guardianship. While under certain circumstances a temporary guardian may properly petition for custody,[9] we reject the notion that third-party custodians may deliberately employ temporary guardianship as a ruse to avoid the clear, unambiguous requirements for standing found in MCL 722.26b and MCL 722.26c.

In summary, the clear and unambiguous language of MCL 710.23d(1)(c)(*iii*) provides that Wolfe retained full parental rights to the child throughout these proceedings. When Wolfe revoked her permission for temporary placement with the Unthanks, the probate and circuit courts erred by embarking on an extended exploration of custodial options. The Unthanks possessed no constitutional or statutory rights to raise the child or to become the child's legal guardians. The requirements of the Child Custody Act for standing serve as bulwarks against unwarranted intrusions into a parent's authority to make fundamental decisions, including the everyday residence of the child. By overlooking those requirements, the circuit and probate courts unduly prolonged this expensive and traumatic litigation.

B

Even assuming that the Unthanks had standing to participate in the custody dispute with Wolfe, our review of the record and Judge Blackwell-Hatcher's meticulously written opinion in this matter reveals no clear legal error on a major issue. The Unthanks

---

[9] In *Kater v Brausen*, 241 Mich App 606; 617 NW2d 40 (2000), this Court held that a temporary guardian *who had filed a petition for guardianship* had standing to bring a third-party custody action. The plaintiff in *Kater* was the stepfather, with whom the children were living when their mother died. *Id.* at 607.

contend that Judge Blackwell-Hatcher committed clear legal error on a major issue by ruling that they had to prevail on each of the "best interest" factors to retain custody of the child. We evaluate the Unthanks' argument guided by the Legislature's mandate that "all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue." MCL 722.28. Clear legal error occurs when a court "incorrectly chooses, interprets, or applies the law . . . ." *Fletcher v Fletcher*, 447 Mich 871, 881; 526 NW2d 889 (1994). "[A] trial court's findings on each factor should be affirmed unless the evidence ' "clearly preponderate[s] in the opposite direction." ' " *Id.* at 879 (citation omitted).

The Child Custody Act governs our review of the Unthanks' claim. The act provides that in a child custody dispute between parents and a third person, "the court shall presume that the best interests of the child are served by awarding custody to the parent or parents, unless the contrary is established by clear and convincing evidence." MCL 722.25(1). This legislative command comports with our state's historical jurisprudence. "It is a well-established principle of law that the parents, whether rich or poor, have the natural right to the custody of their children. The rights of parents are entitled to great consideration, and the court should not deprive them of custody of their children without extremely good cause." *Herbstman v Shiftan*, 363 Mich 64, 67; 108 NW2d 869 (1961). Michigan's presumption favoring parents accords with the principles revisited by the United States Supreme Court in *Troxel v Granville*, 530 US 57, 65-66; 120 S Ct 2054; 147 L Ed 2d 49 (2000). The Supreme Court observed in *Troxel* that

so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children. [*Id.* at 68-69.]

Judge Blackwell-Hatcher's 27-page opinion included a lengthy discussion of the standard of review that she employed during the custody trial. Within that section of her opinion, Judge Blackwell-Hatcher set forth the following:

[T]he "clear and convincing evidence" standard is a substantive standard rather than just an evidentiary standard. Consequently, in order to overcome the natural parent presumption, the Court is required to find that, when all of the factors in MCL 722.23 are collectively considered, the third party must clearly and convincingly establish that the best interests of the child require maintaining custody with him or her. It is not sufficient that the third party may have established by clear and convincing evidence that a marginal, though distinct, benefit would be gained if the children were maintained with him or her. [Citation omitted.]

After finding that the child had an established custodial relationship with the Unthanks, Judge Blackwell-Hatcher returned to a discussion of the law governing her decision, beginning with the "preeminent case on Third Party Custody disputes in Michigan," *Heltzel v Heltzel*, 248 Mich App 1; 638 NW2d 123 (2001). Judge Blackwell-Hatcher summarized *Heltzel* as follows:

[T]he Court of Appeals held that a non parent third party seeking to obtain custody of the child over a fit parent bears the burden of clearly and convincingly demonstrating that all the relevant factors pursuant to MCL 722.23, including the existence of a custodial environment and all the legislatively mandated best interests concerns, taken together, require placement with the third-party [sic].

Her opinion quoted with emphasis the following excerpt from *Heltzel*:

> We hold that, to properly recognize the fundamental constitutional nature of the parental liberty interest while at the same time maintaining the statutory focus on the decisive nature of an involved child's best interests, custody of a child should be awarded to a third-party custodian instead of the child's natural parent only when the third person proves that all relevant factors, including the existence of an established custodial environment and all legislatively mandated best interest concerns within [MCL 722.23], taken together clearly and convincingly demonstrate that the child's best interests require placement with the third person. [*Heltzel, supra* at 27.]

Judge Blackwell-Hatcher rejected the Unthanks' contention that Wolfe and Barnett were unfit parents, which would have eliminated the parental presumption. Her opinion then returned to the evidentiary standard that governed her analysis:

> [T]he Court finds the parental presumption in favor of the Defendant [sic] in this case exists and to rebut this presumption the Plaintiffs must show clear and convincing evidence that the "best interests of the child" require a removal of the child from his natural parents in favor of the established custodial environment provided by the Plaintiffs.

Judge Blackwell-Hatcher then discussed, in more than 10 pages, her findings on each of the best-interest factors. Judge Blackwell-Hatcher found that factors b and d "slightly" favored the Unthanks, factors c, e, f, and k favored the Unthanks, and the parties were equal regarding factors a, g, h, i, and j. The judge viewed factor *l* as favoring Wolfe, largely because the guardian ad litem had recommended that Wolfe have custody of the child. The opinion summarized as follows:

In viewing the "sum total" of the factors under MCL 722.23 in this case, the Court ultimately believes the child in this case has to be returned to his mother even though some of the factors favor the Plaintiffs, as Guardians. As the above-referenced case law suggests, when, as here, the statutory presumption in favor of parental custody and the presumption in favor of the established custodial environment conflict, due process demands that the presumption remain in favor of custody of the natural parents absent a showing of parental unfitness or abandonment. In such cases, it is presumed that the "best interests of the child" are normally served by granting custody to the natural parent. To rebut that presumption, the third-party Plaintiffs in this case must show by clear and convincing evidence that the child's best interests require instead maintaining the established custodial environment. *Heltzel* [248 Mich App at] 24-28. In this regard, the benefit established by the third-party [sic] must also be greater than a marginal benefit. [*Id.*] at . . . 28.

After examining these indisputably correct summaries of the applicable law, Judge Blackwell-Hatcher concluded:

While the court acknowledges that this case is a difficult one because of the Plaintiffs as Guardians have [sic] prevailed on several factors, the Court still believes that custody should be with Christine Wolfe, the child's mother. Although the Unthanks' [sic] may be more stable and responsible, this Court still does not feel these factors alone are enough to rebut the presumption in favor of the Defendant [sic] in this case given the child's young age, and how long Ms. Wolfe has fought for custody over him. Despite some concern over the fitness of Mr. Barnett, Christine Wolfe fought for over three years for her son and did prove she can take care of two daughters. Lastly, the Guardianship although solid with the Unthanks' [sic] was for a relatively short period of years.

As held in *Eldred v Ziny*, 246 Mich. App. 142, 150; 631 NW 2d748 (2001)[:]

"Only when all the legislatively mandated best interest concerns taken together clearly and convincingly demonstrate that the child's best interest require placement with a third person should custody be awarded over the natural parents."

*In the instant case, although the Guardians prevail on some factors, they do not clearly and convincingly prevail on all factors as required by the law.* [Emphasis added.]

We reject the Unthanks' argument that this lone, conclusory sentence, although possibly amounting to legal error, requires a remand of this case. Taken in isolation and entirely out of its context within the balance of the opinion, the contested sentence seems to inaccurately suggest that a third-party custodian must prevail on all statutory best-interest factors.[10] Numerous statements of the law within Judge Blackwell-Hatcher's opinion, together with the complained-of remark when viewed in its proper context, demonstrate that she repeatedly, consistently, and correctly applied the law as analyzed in *Heltzel* by evaluating the totality of the circumstances and applying the proper standard of proof. We cannot conclude that the one arguably

---

[10] *Heltzel* instructs that a court must decide whether "all relevant factors," including the existence of an established custodial relationship, and "all legislatively mandated best interest concerns," collectively considered, "clearly and convincingly demonstrate that the child's best interests require placement with the third person." *Heltzel*, 248 Mich App at 27. In *Henrikson v Gable*, 162 Mich App 248, 252; 412 NW2d 702 (1987), this Court quoted approvingly the following language derived from a previous case: " '[The presumption that the best interests of the child would be served by granting custody to the natural parent] remains a presumption of the strongest order and it must be seriously considered and heavily weighted in favor of the parent.' " (Citation omitted.) We similarly concluded in *Henrikson* that an appropriate application of this strong presumption required a trial court "to find that, when all of the factors in MCL 722.23 . . . were collectively considered, [the third party] clearly and convincingly established that the best interests of the children required maintaining custody with the [third party]." *Henrikson, supra* at 253.

erroneous sentence extracted from a lengthy, factually detailed, well-reasoned opinion mandates another custody hearing.

C

We next briefly address the Unthanks' criticism of Judge Blackwell-Hatcher's determination that Wolfe and Barnett were fit parents and therefore were entitled to the presumption that their custody served the child's best interests. MCL 722.25(1). According to the Unthanks, the parents' failure to provide the child financial support during the five years he resided with the Unthanks, and their failure to visit him regularly during the first two years of his life, rendered Wolfe and Barnett unfit.

We reject the Unthanks' argument that Wolfe's absence from the first two years of the child's life required that she be deemed an unfit parent. The adoption code specifically preserved Wolfe's right to "full parental rights" when she revoked the temporary placement with the Unthanks. MCL 710.23d(1)(c)(*iii*). We decline to negate this legislative pronouncement by holding that Wolfe's failure to more swiftly revoke the temporary placement rendered her unfit. We similarly reject the argument that the failure of Wolfe and Barnett to provide support during the years that this action pended suffices to deny them the presumption favoring parental custody. After Wolfe revoked permission for the child to reside with the Unthanks, she aggressively pursued full custody of the child. By the time the Unthanks filed this third-party custody action, custody of the child had become virtually shared between the parties. Under these circumstances, and in the absence of an order requiring Wolfe to provide further support to the Unthanks, we detect no basis for a finding of Wolfe's unfitness.

In light of our determination that the Unthanks lack standing to obtain custody of the child, we need not address the remaining arguments that Judge Blackwell-Hatcher erred in her findings regarding best-interest factors a, g, and j. For the same reason, we decline to address the arguments raised by Wolfe and Barnett regarding factors b, c, d, f, and k.

D

On cross-appeal, Wolfe argues that the circuit court erred by denying her request for attorney fees. We review for an abuse of discretion a circuit court's decision regarding the necessity or reasonableness of attorney fees. *Reed v Reed*, 265 Mich App 131, 164; 693 NW2d 825 (2005). "Any findings of fact on which the trial court bases an award of attorney fees are reviewed for clear error, but questions of law are reviewed de novo." *Id.* (citations omitted).

In the third-party custody action, Wolfe's counsel moved for attorney fees and expenses under MCR 3.206(C). MCR 3.206(C)(1) and (2)(a) authorize the court to award attorney fees and expenses in a domestic relations action if the party requesting them alleged "facts sufficient to show that . . . the party is unable to bear the expense of the action, and that the other party is able to pay . . . ." MCR 3.201(A)(1) indicates that subchapter 3.200 of the court rules applies to actions that relate to "the custody of minors" under the Child Custody Act. Judge Blackwell-Hatcher entirely failed to make any findings regarding Wolfe's request for attorney fees and expenses under MCR 3.206(C). The opinion referred instead to Wolfe's request for attorney fees under MCR 2.114 and MCR 5.114, and stated: "This custody action has merit and was not frivolous or devoid of legal merit. It was a close case which was very

difficult to decide and therefore the Court will not award fees as a sanction to either party in this case."

Because Judge Blackwell-Hatcher failed to make any findings regarding Wolfe's claim for attorney fees and expenses under MCR 3.206(C), we remand for the expeditious resolution of this issue. We affirm Judge Blackwell-Hatcher's ruling with regard to attorney fees under MCR 2.114 and MCR 5.114, finding no evidence that the Unthanks' efforts to retain custody were unreasonable, vexatious, or motivated by a desire to harass Wolfe or Barnett.

### III. CONCLUSION

We affirm the award of custody to Wolfe and the denial of attorney fees under MCR 2.114 and MCR 5.114. We remand for a determination regarding Wolfe's entitlement to attorney fees and expenses under MCR 3.206(C). We do not retain jurisdiction.